IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02954-RMR-KLM

DUSTIN J. ULLERICH,

      Plaintiff,

v.

JEFF SHRADER, Sheriff, in his official capacity,
CITY OF GOLDEN,
CITY OF ARVADA,
MARK DONAHUE, Golden Police Department Sergeant,
ANTHONY BROWN, Jefferson County Sheriff Deputy,
NICHOLAS TURCO, Jefferson County Sheriff Deputy,
JORDON BYBEE, Jefferson County Sheriff Deputy,
BRETTON CLARKE, Arvada Police Department Officer, and
DOES 3-10,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on the **Motion to Dismiss Plaintiff's First Amended Complaint** [#49], filed by Defendants Jeff Shrader ("Shrader"), Anthony Brown ("Brown"), Nicholas Turco ("Turco"), and Jordan Bybee ("Bybee") (collectively, the "County Defendants")[1]; on the **Motion to Dismiss Plaintiff's First Amended Complaint** [#50], filed by Defendants City of Arvada and Bretton Clarke ("Clarke") (collectively, the "Arvada Defendants"); and on the **Motion to Dismiss** [#51], filed by Defendants City of Golden and Mark Donahue ("Donahue") (collectively, the "Golden Defendants"). Plaintiff

---

[1] On March 3, 2022, Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice of Defendants Jefferson County and Board of County Commissioners (Fed. R. Civ. P. 41(a)(1)(A)(i)) [#53]. Thus, the County Defendants' Motion [#49] is moot to the extent asserted by former Defendants Jefferson County and Board of County Commissioners. *See Order* [#54].

filed Responses [#55, #56, #57] in opposition to the Motions [#49, #50, #51], and Defendants filed Replies [#60, #61, #62].  The Motions [#49, #50, #51] have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) and D.C.COLO.LCivR 72.1.  *See* [#52].  The Court has reviewed the Motions, the Responses, the Replies, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motions [#49, #50, #51] be **GRANTED in part and DENIED in part**.

## I. Background[2]

In short, this lawsuit arises from the execution of an "immediate entry" ("no knock") search warrant at Plaintiff's home which took place at 4:00 a.m. on November 7, 2019. *Am. Compl.* [#43] ¶ 14.  At the time of the underlying events, Plaintiff was around fifty years old, had no criminal history, and was in a committed relationship with Valarie Malcovich ("Malcovich"), with whom he lived in a single-story home located in Golden, Colorado.  *Id.* ¶¶ 15, 17.  He ran a tattoo parlor, was a member of a motorcycle club, and was registered with the Jefferson County Sheriff's Office ("JCSO") as permitted to carry a concealed firearm, which required him to pass a background investigation, make certain disclosures, and abide by the law.  *Id.* ¶¶ 15-16.

The investigation leading to the "immediate entry" search warrant dates at least to July 19, 2019, almost four months before its execution, when a purportedly unreliable informant facing multiple criminal charges, including jumping bail, made unproven

---

[2]  For the purpose of resolving the Motions [#49, #50, #51], the Court accepts as true all well-pled, as opposed to conclusory, allegations made in Plaintiff's Amended Complaint [#43]. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

allegations about several people, including Plaintiff.  According to the warrant application, Plaintiff covered up tattoos at his parlor.  *Id.* ¶ 18.  The warrant included Plaintiff's home and tattoo parlor among nineteen locations to be searched, as well as fourteen other listed individuals.  *Id.*  The simultaneous service of the multi-location search warrant had been in planning for at least a month before the warrant on Plaintiff's home was executed, long before the warrant itself was issued.  *Id.* ¶ 22.

The search warrant application listed the following fifteen categories of personal property to be seized during the search of Plaintiff's home: (1) Hells Angels Motorcycle Club ("HAMC") membership indicia; (2) Destroyers Motorcycle Club ("Destroyers") membership indicia; (3) any "article" showing association with the HAMC or Destroyers; (4) HAMC "Rules" and communications related to HAMC business or membership; (5) Destroyers "Rules" and membership records; (6) documents reflecting HAMC or Destroyers membership; (7) HAMC membership "Out Forms" and group photos; (8) West Coast Officer notes and East Coast Officer notes, phone rosters, and membership background investigation forms; (9) communication devices such as cell phones and iPads; (10) articles of personal property tending to establish the identity of people in control or possession of the place, such as utility company receipts; (11) any electronic devices capable of storing location information and/or communicating with other devices; (12) safes where the other items might be stored; (13) clothing and jewelry items likely to contain DNA trace evidence; (14) 1934 Ford pick-up owned by Plaintiff; and (15) video surveillance system.  *Id.* ¶ 19.

For the most part, these items are documents and records, or storage devices such as personal computers, iPads and phones, or things like clothes and jewelry.  *Id.* ¶

21. According to Plaintiff, virtually none of the items to be seized could be destroyed while a Special Weapons and Tactics ("SWAT") team was making entry. *Id.* No narcotics, weapons, ammunition, or contraband were listed, and the warrant did not seek records of illegal activity such as human, narcotics, or weapons trafficking. *Id.* According to Plaintiff, none of the items listed on the warrant was illegal to possess, membership in motorcycle clubs was not illegal, and the possession of "indicia" of membership or records of club membership and activities was also not illegal. *Id.* ¶ 20.

Plaintiff's home was assigned to Jefferson County Regional SWAT, a joint operation of the JCSO and the Golden and Arvada police departments. *Id.* ¶ 23. Defendant Donahue, a Golden Police Sergeant, directed the Jefferson County Regional SWAT operation at Plaintiff's home. *Id.* ¶ 24. He knew that Plaintiff had no criminal history and possessed a concealed-carry permit for a firearm. *Id.* He also allegedly knew that despite the "no knock" authorization for multiple locations, including Plaintiff's tattoo parlor, the search warrant for Plaintiff's home could have been safely and successfully executed by simply walking up to the front door during daylight hours, knocking or ringing the doorbell, showing the warrant to Plaintiff or whoever else came to the door, and then searching for and seizing the items listed, because none of the items was susceptible to flushing or destruction or could be used as a weapon against the officials serving the warrant. *Id.*

Regardless, Defendant Donahue instructed the SWAT deputies and officers under his command to "breach, bang and hold" Plaintiff's front door, which, in short, means to execute a plan to sneak up on the home, destroy the front door with explosives while breaking windows, and ordering the occupants outside without SWAT entering the home.

Plaintiff states that this plan was "total overkill" given the totality of the circumstances. *Id.* ¶ 25. Allegedly, Defendant Donahue formulated and implemented this "extremely violent, unnecessarily destructive, and dangerous tactical plan" in concert with the individual defendants and others serving the warrant on other locations, because the "no knock" provision created an opportunity to gratuitously damage Plaintiff's home and to harass him in retaliation for alleged associations which were, according to Plaintiff, not in themselves illegal and were actually constitutionally protected. *Id.*

SWAT staged near Plaintiff's home during the early morning of November 7, 2019, because the plan was to attack multiple locations listed in the warrant simultaneously at 4:00 a.m. *Id.* ¶ 26. Inside the home, three people were sleeping: Plaintiff, Ms. Malcovich, and a houseguest who was recovering from injuries sustained in a vehicle accident. *Id.* ¶¶ 17, 26. None had any warrants for his or her arrest, and Plaintiff alleges that each would have complied with police commands and process once awakened. *Id.* ¶ 26.

When Defendant Donahue saw what appeared to be common home security equipment located near the front door, consisting of surveillance cameras and exterior lights activated by a motion detector, he decided against the explosives because, according to the District Attorney's report, "if someone in the residence was awake and came to the door to find out why their motion detector lights were on, there was a potential that the charge detonating at the front door could severely injure or kill that person on the other side of the door." *Id.* ¶ 27. Defendant Donahue switched the plan to a "mechanical breach," which means assigning an officer to use a handheld ram to break down the door. *Id.* All of the SWAT members, including the other individual defendants in this lawsuit,

were briefed on the change in plans and thus allegedly had notice that using ordnance to open the front door posed an unreasonable risk to occupants of the home. *Id.* ¶ 28.

SWAT members approached the house in a "Bearcat" armored car and disembarked wearing helmets, body armor, and balaclava face coverings, allegedly solely for the purpose of looking scary to people whom they would encounter in the home. *Id.* ¶ 29. As they quickly moved onto the front porch, they "needlessly" detonated "flashbang" grenades in the yard, which woke the occupants and alerted them that their home was under "attack" by law enforcement. *Id.*

Defendant Donahue directed Defendant Turco, a JCSO Deputy, to shatter the glass in a window at the front of the home, and Defendant Clarke, an Arvada Police Officer, to fire 40-millimeter rounds through another window, shattering more glass. *Id.* ¶ 30. The sounds of the windows shattering before SWAT attempted to open the front door attracted attention to the front of the house much more dramatically than a "motion detector light" would have done. *Id.* Moreover, Plaintiff alleges that there was no law enforcement purpose for shattering the windows, especially because, even after the windows were shattered, curtains continued to block the SWAT members' views into the house. *Id.* The sounds of the breaking windows attracted Plaintiff's attention to the front of his house and "instilled fear that his home would be further damaged or destroyed unless he took immediate action" to let the SWAT members enter. *Id.*

Despite knowing that it was unsafe for people inside the house to be near the front door while SWAT was forcing entry, Defendant Donahue stood at one of the broken windows and shouted at least twice: "Sheriff's Office, search warrant, come to the door." *Id.* ¶ 31. Defendant Brown, a second JCSO Deputy, held the unlocked outer storm door

open while Defendant Bybee, a third JCSO Deputy, banged on the front door four times with a hand-held ram, although he failed to use enough force to open the door. *Id.* ¶ 32. Despite knowing about the reason for the change in tactics from an "explosive" to a "mechanical" breach, the concern that there were likely people inside coming to the front door who could be seriously injured or killed if the door was opened in a violent manner, and despite all the noise SWAT members had made to attract the attention of the people in the home and bring them toward the front door, including the flash bangs, the broken windows, and the commands from Defendant Donahue, Defendants Bybee and Brown decided to abandon the battering ram and to blow the lock off with a "breaching shotgun," a short-barreled 12-gauge firearm with a pistol grip and special ammunition designed to destroy locks. *Id.*

As the supervisor, Defendant Donahue was told by the deputies that they were switching to the shotgun and could see their actions in doing so. *Id.* ¶ 33. Defendants Turco, Clarke, and Bybee also knew that Defendant Brown was preparing to fire a shotgun through the door while occupants of the house were likely approaching to open it, as commanded. *Id.* They all allegedly knew that the breaching shotgun could not be used at that stage of the entry process without creating a risk of death or great bodily injury to people inside the home, even more so than the use of explosives initially planned but deemed too risky because of the motion detector. *Id.* ¶ 34.

Defendant Brown "knew [the shotgun] could be lethal if the operator was not cautious in using it" and had been trained "to direct the weapon at an angle towards the ground when firing it into the door so that if there was penetration past the door, the round would be directed towards the ground and not into a room where people could be located,"

according to the District Attorney's Report.  *Id*. ¶ 35.  Everyone present, including all of the individual defendants, could see that Defendant Brown was pointing the shotgun level, not at a downward angle, and that he could not safely fire it in that manner at that time. *Id*.  Each of the individual defendants, including Defendant Donahue as the incident commander, Defendant Bybee who was working closely with Defendant Brown to force open the front door, and Defendants Turco and Clarke allegedly had the practical opportunity to intervene and stop Defendant Brown from firing the shotgun into the house, but all failed to do so.  *Id*. ¶ 36.

Plaintiff was awakened by grenades, shattering glass, pounding on the front door, and commands for him to come to the door.  *Id*. ¶ 37.  He immediately understood that law enforcement was responsible for the commotion.  *Id*.  Wearing the T-shirt and boxer shorts in which he had been sleeping, Plaintiff leapt from bed and rushed the short distance to the front door to open it before more of his house was destroyed.  *Id*.  He opened his front door all the way, so that the SWAT members could see he was obviously unarmed.  *Id*.  Defendant Brown saw Plaintiff standing there with nothing in his hands except possibly the doorknob, having obeyed Defendant Donahue's commands to come to the door.  *Id*.  Instead of pointing the shotgun to the ground and de-escalating, Defendant Brown either raised the shotgun or continued to keep the shotgun raised, level with the floor.  *Id*.  Although he faced no threat, Defendant Brown decided to pull the trigger and shoot Plaintiff.  *Id*.

The fact that the front door was undamaged shows it was open all the way when Defendant Brown decided to pull the trigger.  *Id*. ¶ 38.  Defendant Brown could not have fired to open the door because the door had already been opened before Defendant

Brown pulled the trigger, even though Plaintiff was fully visible, wearing his underclothes, cooperating with SWAT, and posing no threat, according to Plaintiff.  *Id.*  The location of the gunshot wound on Plaintiff's right abdomen demonstrates that Defendant Brown pulled the trigger while holding the shotgun level, not pointed down, where he would have pointed it were he using it to force open the door.  *Id.* ¶ 39.

Plaintiff collapsed to the floor, and Ms. Malcovich screamed.  *Id.* ¶ 40.  SWAT members describe that Plaintiff's "intestines were protruding to the outside of the . . . stomach through a small golf ball sized hole," describing the wound as "an 'evisceration'" such that "a baseball size portion of the subject's intestines were hanging out of the upper right quadrant of his abdomen."  *Id.*  Plaintiff was transported to St. Anthony Hospital in Lakewood for lifesaving emergency treatment.  *Id.* ¶ 41.  On November 12 he was transferred to Denver Health, where he was put into a medically induced coma for several weeks.  *Id.*  Most of his large intestine had to be removed.  *Id.*  This loss of his large intestine is permanent and affects him throughout the day, every day, and his right abdomen has a large, grotesque deformity.  *Id.* ¶ 42.  No criminal charges were filed based on Plaintiff's conduct on November 7, 2019, although he is facing charges relating to the grounds stated in the initial search warrant affidavit.  *Id.* ¶ 43.

Under his First Claim for Relief, Plaintiff asserts various claims against the individual Defendants for the deprivation of his civil rights, including (1) unreasonable search under the Fourth Amendment, (2) excessive force under the Fourth Amendment, and (3) due process violation under the Fourteenth Amendment.  *Id.* ¶¶ 49-67.  Under his Second Claim for Relief, he asserts various claims against the entity Defendants for deprivation of his civil rights based on alleged shortcomings in their policies, practices,

and training.  *Id.* ¶¶ 68-72.  Plaintiff seeks compensatory damages from all Defendants and punitive damages from the individual Defendants for these asserted violations.  *Id.* ¶ 73.  In the present Motions [#49, #50, #51], Defendants seek dismissal of all claims pursuant to Fed. R. Civ. P. 12(b)(6), except for the Fourth Amendment claims against Defendant Brown.  *See Motion* [#49] at 1.

## II.  Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted").  To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); see also *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations" (quoting *Twombly*, 550 U.S. at 570)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Moreover, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotation marks omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). As the Tenth Circuit has explained, "the mere metaphysical possibility that [the] plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that [the] plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). However, "[t]he court's function on a 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

### III.  Analysis

To state a 42 U.S.C. § 1983 claim, Plaintiff must allege facts establishing the deprivation of a right secured by the Constitution or laws of the United States and that the deprivation was committed under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1143 (10th Cir. 2014). At the outset, the Court emphasizes that Plaintiff has not challenged the no-knock search warrant itself, but merely the way it was executed by Defendants. *See, e.g.*, *Response* [#57] at 6 n.1 (stating that Plaintiff has "elected not to challenge the warrant's validity" in the Amended Complaint [#43]). Therefore, the following analysis regarding the execution of the warrant proceeds on the assumption that the warrant itself was valid.

### A.    Individual Capacity Claims

- 11 -

The individual Defendants assert that they are entitled to qualified immunity on Plaintiff's claims. *Motion* [#49] at 4-5; *Motion* [#50] at 5; *Motion* [#51] at 6-7. Qualified immunity, in certain circumstances, protects government officials from liability for civil damages when they are sued in their individual capacities. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 814-18 (1982). They "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that although qualified immunity determination involves a two-part inquiry, if the plaintiff fails either inquiry reviewed in any order, no further analysis need be undertaken and qualified immunity is appropriate). The Supreme Court has stated that "[f]or executive officials in general . . . our cases make plain that qualified immunity represents the norm." *Harlow*, 457 U.S. at 807. Thus, a government official is entitled to qualified immunity in "[a]ll but the most exceptional cases." *Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997).

### 1.   Fourth Amendment: Search and Seizure

In short, "[t]he Fourth Amendment guarantees a person's right to be free from 'unreasonable searches and seizures.'" *United States v. Frazier*, 30 F.4th 1165, 1172 (10th Cir. 2022) (quoting U.S. Const. amend. IV). In full, this amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

### a. Whether a Constitutional Right Was Violated

"As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 652 (1995).  Thus, "[a]fter obtaining a warrant, the Fourth Amendment also requires officers to conduct the search and seizure reasonably."  *United States v. Palm*, 21 F.4th 689, 697 (10th Cir. 2021); *see also United States v. Muhtorov*, 20 F.4th 558, 592 (10th Cir. 2021) ("A search or seizure satisfies the Fourth Amendment if it is reasonable." (citing *Riley v. California*, 573 U.S. 373, 381-82 (2014)).

"In assessing reasonableness, we examine the totality of the circumstances." *Muhtorov*, 20 F.4th at 602 (citing *Samson v. California*, 547 U.S. 843, 848 (2006)).  This means that a Fourth Amendment search "must be reasonable in its scope *and* manner of execution."  *Maryland v. King*, 569 U.S. 435, 448 (2013) (emphasis added).  "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).  To meet this test, the Court balances "the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy."  *King*, 569 U.S. at 448 (brackets and quotation marks omitted); *see also Illinois v. McArthur*, 531 U.S. 326, 331 (2001) ("[W]e balance the privacy-related and law enforcement-related concerns.").  "The reasonableness balancing test is particularly concerned with ensuring that a search and seizure is 'both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests.'"  *Muhtorov*, 20 F.4th at 602 (quoting *McArthur*, 531 U.S. at 337).

Defendant Clarke and Defendant Turco each allegedly broke a window in Plaintiff's home, allegedly at Defendant Donahue's direction. *Am. Compl.* [#43] ¶ 30. Plaintiff states that these actions were for no legitimate purpose in executing the warrant. *Id.*; *Response* [#55] at 9; *Response* [#57] at 9. Defendant Clarke, in particular, takes issues with this allegation as being conclusory and therefore asks the Court to disregard it. *Motion* [#50] at 6-8. However, the Court must nevertheless balance the competing protections of the Fourth Amendment with the interests of law enforcement in executing the warrant. *See King*, 569 U.S. at 448. In other words, the mere fact that Defendants had a valid warrant does not mean that any and all actions taken in connection with the execution of that warrant are automatically reasonable and therefore pass muster under the Fourth Amendment. *See Palm*, 21 F.4th at 697. Here, even disregarding the purely conclusory statement that Defendants' actions served no legitimate purpose, there must be allegations in the Amended Complaint [#43] from which it can otherwise be inferred that Defendant's actions did not serve, or were not intended to serve, a legitimate purpose. *See King*, 569 U.S. at 448 (stating that the Court examines whether the defendants' actions served to promote "legitimate governmental interests").

"The procedural posture of the qualified-immunity inquiry may be critical." *Thompson*, 23 F.4th at 1256. "Because they turn on a fact-bound inquiry, qualified immunity defenses are typically resolved at the summary judgment stage rather than on a motion to dismiss." *Id.* (internal quotation marks omitted). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (citation and internal quotation marks omitted). "On a motion to dismiss, 'it is the defendant's conduct

as alleged in the complaint that is scrutinized for [constitutionality].'"  *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).  Here, the Court finds that the allegations in the Amended Complaint adequately allege that Defendants' actions did not serve, and were not intended to serve, any legitimate purpose.

Before addressing the specifics of this case, the Court considers two cases where the plaintiff was required to allege, and successfully did so, that the defendants' actions did not serve a legitimate purpose.  First, *Colbruno v. Kessler*, 928 F.3d 1155 (10th Cir. 2019), concerned a Rule 12(b)(6) motion to dismiss a Fourteenth Amendment claim where the defendant officers asserted a qualified immunity defense.  The Tenth Circuit Court of Appeals noted that the "court must decide . . . whether [the defendants' alleged action] is but an incident of some . . . legitimate governmental purpose."  *Colbruno*, 928 F.3d at 1162 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).  The Tenth Circuit further noted: "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action . . . may not constitutionally be inflicted . . . ."  *Colbruno*, 928 F.3d at 1163 (quoting *Bell*, 441 U.S. at 539).  The Court of Appeals stated that the plaintiff could adequately allege "that official actions constitute unconstitutional punishment . . . 'by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective.'"  *Colbruno*, 928 F.3d at 1163 (quoting *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013)).  In other words, the plaintiff in *Colbruno* was required to provide allegations that the defendants' action "was not rationally related to a legitimate governmental objective . . . ."  *Colbruno*, 928 F.3d at 1164 (quoting *Kingsley*, 576 U.S. 389, 398 (2015)).  In evaluating the allegations of the plaintiff's complaint, the Court held:

Defendants argue that Plaintiff needed medical treatment urgently, and that finding another covering for him before transporting him through the hospital would have taken too much additional time and effort.   But Plaintiff has alleged facts supporting the reasonable inference that no vital urgency justified Defendants' actions.   His complaint states that Defendants took more than two hours to transport him to the hospital.   It also alleges that at the end of his [naked] walk through the hospital he was chained to a hospital bed, not immediately x-rayed or provided with treatment.   The district court ruled that these allegations were sufficient to support the inference that Plaintiff's condition was not so urgent that Defendants could not have delayed walking him into the hospital for "[t]he additional moment that would have been required to locate and place a smock" on him.   We agree with the district court.   It is common sense that acquiring some replacement clothing at a hospital would be at most a matter of minutes, and we can reasonably infer from the long delay in transporting Plaintiff that Defendants' actions were not based on a medical need so pressing that they could not spare a little time to obtain a dignified covering.

*Colbruno*, 928 F.3d at 1164-65 (internal citation omitted).

Second, *Denson v. Rios*, No. 19-cv-00233-CMA-STV, 2019 WL 7161695 (D. Colo. Dec. 23, 2019), concerned a Rule 12(b)(6) motion to dismiss a Fourth Amendment claim where the defendant officers asserted a qualified immunity defense.   The court noted that "[a] strip search must be reasonably related to a legitimate penological interest," i.e., that "[a] prisoner's limited constitutional right to bodily privacy and to be free of unreasonable searches and seizures must be weighed against the requirements of prison administration."   *Denson*, 2019 WL 7161695, at *8 (citing *Farmer v. Perrill*, 288 F.3d 1254, 1259-60 (10th Cir. 2002); *Turner v. Safley*, 482 U.S. 78, 84-85 (1987)).   The defendants argued in their motion that the plaintiff had "fail[ed] to sufficiently allege that the searches violated his Fourth Amendment rights because he does not allege . . .that there was no legitimate penological interest for the search."   *Denson*, 2019 WL 7161695, at *8.   The court disagreed, stating:

While "[s]imply invoking conclusory terms like 'harassing' or 'retaliation' is not enough" to allege a plausible Fourth Amendment claim, the Court finds

that Defendant has made several allegations that allow the Court to infer the searches were conducted in an unreasonable manner and without legitimate penological purpose:

• Plaintiff was strip searched three times a day.

• "The Plaintiff was ordered to take off all his clothing, bend over, spread his anus and allow various C.O.s (names unknown from different days) to look into his cavity."

• "On date May 21, 2018 John Doe #2 (name unknown) told the Plaintiff he received a[ ] phone call from Lt[.] Ross, who was the recreation C.O. John Doe #2 supervisor, and Lt[.] Ross ordered him to strip search the Plaintiff whenever he leaves from work at recreation, and to leave a note letting other C.O.s know this is Lt. Ross['s] order" "for other C.O.s to follow."

• "This order was given by Major Rios to Lt. Ross, and Lt. Ross ordered C.O. John Doe #2 and other C.O.s to retaliate."

• The strip searches were "excessive, cruel, embarrassing, demeaning" and "caused psychological pain, stress, and depression. The Plaintiff now suffer[s] migraine headaches[ ] and anxiety."

• Plaintiff's case manager "advised the Plaintiff if he filed a[ ] grievance he would be further retaliated [against] by Major Rios and Lt[.] Ross. This case manager . . . advised the Plaintiff to file an [i]nformal [g]rievance, not a grievance."

• Plaintiff, by way of an informal grievance, "informed Major Frayre of the strip searches ordered by Lt. Ross and Major Rios . . . to harass him."

• "Major Frayre gave the informal grievance to Major Two Bear. Major Two Bear came to recreation to discuss the strip searches with the Plaintiff, then Major Two Bear told the Plaintiff he will talk to Lt. Ross. That day the strip searches stopped . . . ."

*Denson*, 2019 WL 7161695, at *8-9 (internal citations and footnote omitted).

Here, Defendants rely heavily on *United States v. Ramirez*, 523 U.S. 65, 71-72 (1998), for the proposition that an officer breaking a single window during the execution of a no-knock warrant is constitutional under the Fourth Amendment. *Motion* [#49] at 6; *Motion* [#50] at 7-8. *Ramirez* is more nuanced than Defendants imply, however. The case does *not* stand for the proposition that it is always reasonable under the Fourth Amendment for an officer to break a window during the execution of a no-knock warrant. There, the Supreme Court noted that the officers had specific reasons for breaking the window: "They did so because they wished to discourage [the subject of the manhunt], or

any other occupant of the house, from rushing to the weapons that the informant had told them respondent might have kept there." *Ramirez*, 523 U.S. at 71-72 (noting that the subject of the manhunt was "a prison escapee with a violent past who reportedly had access to a large supply of weapons" and "had vowed that he would 'not do federal time'"). Thus, the Supreme Court found that the defendants had pointed to a legitimate purpose which weighed in favor of finding that the breaking of the window was reasonable to execute the warrant and that the Fourth Amendment was therefore not violated.

Here, no such reasoning supporting such a similar finding appears in the Amended Complaint [#43].  Plaintiff alleges that, "even after the windows were shattered, curtains continued to block the SWAT members views into the house." *Am. Compl.* [#43] ¶ 30. There are no allegations that anything was thrown into the house by any Defendant, or, as in *Ramirez*, that any officer "pointed a gun through the opening, hoping thereby to dissuade any of the occupants from rushing to the weapons the officers believed might be" inside. *Ramirez*, 523 U.S. at 69.  Plaintiff does allege that Defendant Donahue "stood at one of the broken windows and shouted at least twice: 'Sheriff's Office, search warrant, come to the door.'" *Am. Compl,* [#43] ¶ 31.  However, there is no indication in the Amended Complaint [#43] that the purpose of breaking the windows was to allow Defendant Donahue's voice to carry into the house.  Indeed, this *possible* reason for breaking *a* window is undermined by the fact that multiple windows were shattered, and by the fact that Defendants in their briefs do not assert this as a reason for why the windows were broken.  For the Court to find otherwise would be pure speculation.

As noted above, "[a]fter obtaining a warrant, the Fourth Amendment also requires officers to conduct the search and seizure reasonably." *Palm*, 21 F.4th at 697.  The

Supreme Court emphasized in *Ramirez* that "[t]he general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant. Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful . . . ." *Ramirez*, 523 U.S. at 71 (internal citation omitted). Here, although there may well be legitimate reasons for breaking the windows in the furtherance of the execution of the warrant, that is an issue which must explored in discovery. At this stage, based on the allegations in the Amended Complaint [#43], there is no indication that breaking the windows in Plaintiff's house was limited and tailored reasonably to secure law enforcement needs. *See Muhtorov*, 20 F.4th at 602. Thus, the Court finds that Plaintiff has stated a claim with respect to Defendants Donahue, Clarke, and Turco.[3]

With respect to Defendant Bybee, the Court comes to a different conclusion. Plaintiff alleges that Defendant Bybee "banged the front door four times with a hand-held ram" and that he "failed to use enough force to open the door." *Am. Compl.* [#43] ¶ 32. Defendants Bybee and Brown then "decided to abandon the battering ram and to blow the lock off with a 'breaching shotgun,' a short-barreled 12-gauge firearm with a pistol grip and special ammunition designed to destroy locks." *Id.* From these minimal allegations, the Court deduces the following. First, with the no-knock warrant in hand, Defendant

---

[3] Defendant Clarke's citations to 18 U.S.C. § 3109 and *Dahlia v. United States*, 441 U.S. 238, 258 (1979), do not alter this analysis. *Motion* [#50] at 8. The statute applies only after an officer "is refused admittance," which is inapplicable based on the allegations of the Amended Complaint [#43]. In *Dahlia*, the United States Supreme Court stated: "[O]fficers executing search warrants on occasion must damage property in order to perform their duty." The key phrase here is "in order to perform their duty." As discussed above, the allegations of the Amended Complaint [#43] support a finding, for purposes of adjudicating the present Motions, that breaking the windows of Plaintiff's home was not necessary, or even thought to be necessary, for the officers here to perform their duty and execute the warrant.

Bybee was legally authorized to enter the house.  Second, Defendant Bybee attempted to do so by breaking down the door with a hand-held battering ram.  Third, this attempt was unsuccessful, and Plaintiff does not allege that it was unreasonable to fail to make further attempts with the ram.  Fourth, Defendant Bybee devised a secondary plan for opening the door which involved use of the breaching shotgun.  Fifth, Defendant Bybee did not wield the shotgun and, in fact, the shotgun was not ultimately used to open the door, given that Plaintiff opened the door first.  Plaintiff does not argue that use of the battering ram was unconstitutional.  In short, other than generally being a member of the raid on Plaintiff's home, Plaintiff does not point to any specific actions taken by Defendant Bybee which show that his actions in the search-and-seizure operation were unconstitutional.

Accordingly, the Court **recommends** that the County Defendants' Motion [#49] be **granted in part** to the extent that Plaintiff's Fourth Amendment search-and-seizure claim against Defendant Bybee be **dismissed with prejudice** for failure to state a claim.  *See Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990) (holding that prejudice should attach to a dismissal when the plaintiff has not made allegations "which, upon further investigation and development, could raise substantial issues").

### b.    Whether the Constitutional Right Was Clearly Established

Thus, the Court turns to the second prong of the qualified immunity analysis on this claim with respect to Defendants Donahue, Clarke, and Turco only.  "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."  *Estate of Beauford v. Mesa County, Colorado*, 35 F.4th 1248, 1268 (10th Cir. 2022) (internal brackets, ellipsis,

and quotation marks omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).  "To establish that the law was clearly established in this context, the plaintiff must point to Supreme Court or Tenth Circuit precedents in point, or to the clear weight of authority from other circuit courts deciding that the law was as the plaintiff maintains."  *Thompson v. Ragland*, 23 F.4th 1252, 1255 (10th Cir. 2022).  "[E]xisting law must have placed the constitutionality of the [public official's] conduct beyond debate."  *Id.* (quoting *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted).  However, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."  *Thompson*, 23 F.4th at 1255-56 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 666 (2002) (brackets and internal quotation marks omitted)).  "We have therefore adopted a sliding scale to determine when law is clearly established."  *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016).  "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  *Id.* at 1135-36.  It is not necessary to show that "the very action in question has previously been held unlawful, [but] in the light of pre-existing law the unlawfulness must be apparent."  *Id.* at 1136 (internal alterations and quotation marks omitted).

The Court finds that the constitutional right at issue was clearly established at the time of the November 7, 2019 raid on Plaintiff's home.  This is not a situation where a case is needed to determine whether a defendant's actions based on a particular reason were reasonable in the context of warrant execution because, here, the Court is presented with allegations which sufficiently allege that there was no legitimate underlying

reason as to why Plaintiff's home was damaged through the destruction of its windows. The law has been clear for many years that "[e]xcessive or unnecessary destruction of property in the course of a search" violates the Fourth Amendment, i.e., that there must be an articulable reason behind the destruction of private property when executing a warrant.  *Ramirez*, 523 U.S. at 71.  Here, in the absence of *any* legitimate reason underlying the governmental action, the Court finds that the law was clearly established that such alleged wanton destruction was unconstitutional.  *See King*, 569 U.S. at 448 (stating that the Court examines whether the defendants' actions served to promote "legitimate governmental interests").  Of course, on a motion for summary judgment, Defendants may provide evidence of such reasons and, at that time, renew their request for qualified immunity.  However, at this stage, the Court finds that the law was clearly established that the destruction of private property *for no reason* in the execution of a warrant is unconstitutional under the Fourth Amendment.  Defendants Donahue, Clarke, and Turco are not entitled to qualified immunity at this time.

Accordingly, the Court **recommends** that the Motions [#49, #50, #51] be **denied in part** to the extent that Defendants Donahue, Clarke, and Turco seek dismissal of Plaintiff's Fourth Amendment search-and-seizure claim against them.

### 2.    Fourth Amendment: Excessive Force: Failure to Intervene

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "In evaluating a claim of excessive force, courts consider whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Wilkins v. City of Tulsa, Okla.*, 33 F.4th 1265, 1273

(10th Cir. 2022) (internal quotation marks omitted) (citing *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (per curiam)).   "To assess objective reasonableness, we evaluate whether the totality of the circumstances justified the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"   *Wilkins*, 2022 WL 1310201, at *4 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"[A] plaintiff can maintain a claim for failure to intervene only when some other officer used excessive force."   *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty., Okla.*, 989 F.3d 1165, 1175 (10th Cir. 2020).   Here, for purposes of the present Motions [#49, #50, #51], the individual Defendants do not contest that excessive force was used on Plaintiff by Defendant Brown.   Thus, the only question is whether Plaintiff has adequately alleged that Defendants Donahue, Clarke, Turco, and Bybee violated Plaintiff's Fourth Amendment rights by failing to intervene to stop Defendant Brown's alleged use of excessive force.

"It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983."   *Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011).   "Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."   *Id.*   "In order to be liable for failing to intervene, the officers must have observed or had reason to know of a constitutional violation and have had a realistic opportunity to intervene."   *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (internal quotation marks and brackets omitted).

Here, the Court finds that Plaintiff has not provided adequate, non-conclusory allegations that Defendants Donahue, Clarke, Turco, and Bybee "had a realistic opportunity to intervene." *See id.* For example, there are no allegations that any of these Defendants saw, heard, or otherwise knew Plaintiff was actually coming to the door; that, once Plaintiff opened the door, anyone believed that Defendant Brown would pull the trigger; or that there was sufficient time to act to stop Defendant Brown from pulling the trigger between the time when Plaintiff opened the door and when Defendant Brown pulled the trigger. In *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008), the Tenth Circuit Court of Appeals held that officers could be held liable for failing to intervene where the excessive force occurred over the course of three-to-five minutes. Here, the single pull of a gun's trigger, without adequate allegations to show that these Defendants knew that Defendant Brown was likely to pull the trigger, is insufficient to sufficiently allege a constitutional violation.

Accordingly, the Court **recommends** that the Motions [#49, #50, #51] be **granted in part** to the extent that Plaintiff's Fourth Amendment failure-to-intervene claim against Defendants Donahue, Clarke, Turco, and Bybee be **dismissed without prejudice** for failure to state a claim. *See Reynoldson*, 907 F.2d at 127 (holding that prejudice should not attach to a dismissal when the plaintiff has made allegations "which, upon further investigation and development, could raise substantial issues").

### 3.    Fourteenth Amendment: Due Process

The Due Process Clause of the Fourteenth Amendment declares that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law[.]" Here, Plaintiff asserts a substantive due process claim, relying heavily on *Browder v. City*

*of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015).   There, the Tenth Circuit Court of Appeals stated that the due process clause "prohibits the government from depriving individuals of their lives, liberty, or property without due process of law.  The Supreme Court has interpreted this language as guaranteeing not only certain procedures when a deprivation of an enumerated right takes place (procedural due process), but also as guaranteeing certain deprivations won't take place without a sufficient justification (substantive due process)."   *Browder*, 787 at 1078.   The Tenth Circuit noted that determining the viability of substantive due process claims in this "murky area" of action by law enforcement personnel is "much unchartered" [sic].  *Id.* at 1079, 1080.

Under the circumstances of this case, however, the Court finds that it need not delve deeply into the merits of such a claim.  The United States Supreme Court has stated: "Because we have always been reluctant to expand the concept of substantive due process, we held in *Graham v. Connor*, 490 U.S. 386 (1989), that where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."   *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (internal quotation marks, alterations, and citations omitted).  The Supreme Court further explained that *Graham* "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."   *Id.* at 843 (quoting

*United States v. Lanier*, 520 U.S. 259, 272, n. 7 (1997)).  Thus, a "[s]ubstantive due process analysis is . . . inappropriate" if the "claim is 'covered by' the Fourth Amendment." *Id.*  A substantive due process claim is appropriate only "for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest, investigatory stop or other seizure."  *Id.* (quoting *Pleasant v. Zamieski*, 895 F.2d 272, 276, n.2 (6th Cir. 1990).

Here, the actions at issue were a search and seizure directed at Plaintiff and his home.  This is not a situation where, for example, an innocent bystander was injured by officer action, as allegedly occurred in *Lewis* and in *Browder*.  Plaintiff has provided no allegations to show that his claims do not directly fall under the Fourth Amendment's protections provided during the execution of a valid warrant.  The Court has found no legal authority holding that simply because a claim may not *succeed* under the Fourth Amendment that it should instead alternatively be adjudicated under the Fourteenth Amendment.  Here, Plaintiff's rights to reasonable search and seizure by the government and to not have excessive force used against him in the execution of a search and seizure by the government are both directly covered by the Fourth Amendment.

Accordingly, the Court **recommends** that the Motions [#49, #50, #51] be **granted in part** to the extent that Plaintiff's Fourteenth Amendment substantive due process claim against Defendants Donahue, Clarke, Turco, Bybee, and Brown be **dismissed with prejudice** for failure to state a claim.  *See Reynoldson*, 907 F.2d at 127 (holding that prejudice should attach to a dismissal when the plaintiff has not made allegations "which, upon further investigation and development, could raise substantial issues").

**B.      Claim Two: Official Capacity and Municipal Liability Claims**

"An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  Thus, because Defendant Shrader is sued in his official capacity as Sheriff, this claim is interpreted as a claim against the governmental entity for whom he works, the JCSO.  Plaintiff alleges that "[t]he JCSO, the Golden Police Department and the Arvada Police Department jointly staff and operate Jefferson County Regional SWAT, and in turn, are responsible for the policies, practices and training of Jefferson County Regional SWAT members, including each of the individual defendants." *Am. Compl.* [#43] ¶ 69.

To assert a municipal liability claim against Defendants Schrader, City of Golden, and City of Arvada, Plaintiff must allege that: (1) his constitutional rights were violated; and (2) a municipal policy or custom was the moving force behind the constitutional deprivation(s). *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  These three Defendants argue that Plaintiff fails to adequately allege the second element of this claim against them.  As explained below, the Court finds that Plaintiff has failed to provide specific allegations demonstrating the existence of a custom or policy to support the second element of his claim.  *See, e.g.*, *Carbajal v. St. Anthony Cent. Hosp.*, No. 12-cv-02257-REB-KLM, 2013 WL 4799654, at *3 (D. Colo. Sept. 6, 2013).

Plaintiff lists the following purported "policies, practices, customs and training of Jefferson County Regional SWAT":

a.      Abusively serving unnecessary no-knock warrants to retaliate against people disliked by officers, including retaliation based on First-Amendment protected activities such as a motorcycle club membership.

b.      Treating "no knock" and "immediate entry" search warrants as unrestrained by Fourth-Amendment standards of reasonableness, and allowing for the wanton and unnecessary detonation of explosives and destruction of property, along with other tactics, including the unnecessary use of firearms, that have the high likelihood of terrifying and causing serious injury to members of the public.

c.      Equipping SWAT members with military equipment far exceeding what would be necessary to serve search warrants and encouraging the use of that equipment unnecessarily.

d.      Failing to equip SWAT members with body-worn video cameras so that their activities can be adequately supervised and monitored.

e.      Allowing "breaching shotguns" to be used without adequate training and without appropriate limitations on their use, with deliberate indifference to the precautions necessary to prevent injuries to members of the public such as Plaintiff.

f.      Failing to adequately train, supervise, and control officers in uses of force, constitutional limitations on the execution of search warrants, and the unnecessary destruction of property.

g.      Failing to set up systems to prevent abuse by officers including the failure to properly investigate timely and, when appropriate, disciplin[ary] uses of force.

h.      Failing to terminate or otherwise discipline officers who abuse their authority.

i.      Failing to arrest officers who commit crimes during SWAT operations and referring them for prosecution.

j.      Condoning and encouraging officers in the belief that they can violate the rights of persons such as Plaintiff with impunity, knowing that their conduct will not adversely affect their opportunities for retention, promotion, and other employment benefits.

*Am. Compl.* [#43] ¶ 71.

In the absence of an official policy, municipal liability claims may only survive if the challenged practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996)

(quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)).  To prove a custom, therefore, a plaintiff must allege "[t]he existence of a continuing, persistent and widespread practice of unconstitutional misconduct."  *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cnty., Kan.*, 996 F.2d 1035, 1041 (10th Cir. 1993).  A single incident of unconstitutional conduct is insufficient to plausibly suggest the existence of a custom or widespread practice.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985); *Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir.1989); *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1196-97 (D.N.M. 2004); *see Andersen v. City of Colorado Springs*, No. 20-cv-02032-RBJ, 2022 WL 910952, at *7 (D. Colo. Mar. 29, 2022) ("The complaint describes a single case of excessive force by the Teller County Sheriff's department.  This does not establish a . . . custom." (internal citation omitted)).

Here, because the Amended Complaint [#43] does not provide non-conclusory allegations suggesting that anyone other than Plaintiff himself was ever subjected to the alleged unconstitutional actions by Defendants, Plaintiff has not sufficiently asserted a viable claim based on the existence of a custom or practice.  *See, e.g.*, *Johnson v. Pelle*, No. 19-cv-02830-RM-KLM, 2020 WL 6119529, at *11 (D. Colo. Aug. 24, 2020); *Andersen*, 2022 WL 910952, at *7 ("Plaintiff's claim sufficiently alleged a Colorado Springs policy of permitting or encouraging unlawful arrests by describing eight other instances of unlawful arrests."); *see also Mullins v. Colorado Springs*, ___ F. Supp. 3d ___,___, No. 21-cv-00589-WJM-KMT, 2021 WL 5919201, at *11 (D. Colo. Dec. 15, 2021) (stating in connection with a failure-to-train theory that the plaintiff "has failed to allege a pattern of other, similar constitutional violations" and in connection with an informal custom theory that the plaintiff

"does not allege any other instance of this kind of constitutional violation having occurred at any other time").

In the absence of an adequately alleged custom or practice, Plaintiff must allege the existence of an official policy. *See Tuttle*, 471 U.S. at 823-24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability [against a municipality], unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). "In order to warrant liability, a municipal policy must be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *Lankford*, 73 F.3d at 286 (citation and internal quotation marks omitted). Here, Plaintiff has not alleged any specific such policy statement, ordinance, regulation, or decision adopted or promulgated by Defendant Schrader, the City of Golden, and/or the City of Arvada regarding the circumstances presented here. In other words, Plaintiff has not alleged any facts (as opposed to mere conclusions) to plausibly suggest that an official with final policymaking authority over this particular area of concern adopted or promulgated such a policy. *See Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009); *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Even if Plaintiff had so alleged, he still must provide further allegations "that the City intended the unconstitutional conduct to happen or was deliberately indifferent to the possibility that unconstitutional conduction would result from the policies." *Mullins*, 2021 WL 5919201, at *12 (citing *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)). Therefore, the Court finds that Plaintiff fails to sufficiently allege the second prong of the municipal liability test.

Accordingly, the Court **recommends** that the Motions [#49, #50, #51] be **granted** to the extent that Plaintiff's Claim Two (the only claim asserted against Defendants Shrader, the City of Golden, and the City of Arvada) be **dismissed without prejudice**. *See Hicks v. Anderson*, No. 11-cv-00422-WJM-KMT, 2012 WL 1415338, at \*7 (D. Colo. Jan. 23, 2012); *see also Brown*, 520 U.S. at 404; *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

## IV. Conclusion

Based upon the foregoing,

IT IS HEREBY **RECOMMENDED** that the Motions [#49, #50, #51] be **GRANTED in part and DENIED in part**. The Court **recommends** that the County Defendants' Motion [#49] be **denied** as to the Fourth Amendment search-and-seizure claim against Defendant Turco and **granted** in all other respects.[4] The Court **recommends** that the Arvada Defendants' Motion [#50] be **denied** as to the Fourth Amendment search-and-seizure claim against Defendant Clarke and **granted** in all other respects. The Court **recommends** that the Golden Defendants' Motion [#51] be **denied** as to the Fourth Amendment search-and-seizure claim against Defendant Donahue and **granted** in all other respects.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo

---

[4] The Court reiterates that the County Defendants have not moved to dismiss Plaintiff's Fourth Amendment claims against Defendant Brown, *see Motion* [#49] at 1, thus those remain in the case as well.

review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  *Makin v. Colo. Dep't of Corrs.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: July 14, 2022

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge