**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Regina M. Rodriguez**

Civil Action No. 1:21-cv-02954-RMR-KAS

DUSTIN J. ULLERICH,

Plaintiff,

v.

ANTHONY BROWN,

Defendant.

---

**ORDER ON DEFENDANT BROWN'S MOTION FOR SUMMARY JUDGMENT**

---

In this case, Plaintiff Dustin Ullerich alleges that he was shot by Defendant Anthony Brown, a Jefferson County Regional Special Weapons and Tactics ("JCRS") team member, as Brown executed a warrant for Ullerich's arrest. ECF No. 43 at ¶ 3. He has sued under 42 U.S.C. § 1983, arguing that Brown violated his Fourth Amendment Rights.

Brown has moved for summary judgment. *See* ECF No. 175. He asks the Court to dismiss Ullerich's claims on the grounds that they are barred by the doctrine of qualified immunity. The matter is now fully briefed and is ripe for review. For the reasons stated below, Defendant Brown's Fed. R. Civ. P. 56 Motion for Summary Judgment is **GRANTED**.

# I. LEGAL STANDARD

## a. Summary Judgment

To succeed on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine dispute of material fact; and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. When analyzing a motion for summary judgment, courts must "look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

However, the nonmovant may not simply rest upon its pleadings at this stage; rather, it must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c) (a party must assert or dispute a fact based on particular parts of the record).

Ultimately, the Court's inquiry on summary judgment is whether the evidence identified by the parties presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## b. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"Because of the underlying purposes of qualified immunity, [courts] review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). Once a defendant asserts qualified immunity, "the burden shifts to the plaintiff to establish (1) a violation of a constitutional right (2) that was clearly established" at the time of the violation. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). Courts can analyze either issue first, and they need not address both if the plaintiff does not establish one or the other. *Thomson v. Salt Lake City*, 584 F.3d 1304, 1312 n.2 (10th Cir. 2009) (citing *Pearson*, 555 U.S. at 236). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Medina*, 252 F.3d at 1128.

## II. FACTS

### a. Undisputed Facts

The parties submitted an Amended Statement of Undisputed Facts ("SOF"). ECF No. 141. Many of the material events of this case were also captured on video. *See* ECF No. 143. The Court has reviewed the SOF and the video and finds that the following facts are not subject to genuine dispute.

1. At approximately 4 a.m. on November 7, 2019, a JCRS team executed search and arrest warrants (the "Warrants") at Plaintiff Dustin Ullerich's residence, 2301 Youngsfield Street, Golden, Colorado 80401.

2. The Warrants were the result of an Alcohol, Tobacco, and Firearms ("ATF") investigation into crimes committed by members of the Denver Charter of the Hells Angels Motorcycle Club ("HAMC").

3. The affidavits in support of the Warrants detailed how HAMC member Josh O'Bryan had a falling out with the wider gang.

4. The affidavits in support of the Warrants detailed how HAMC members summoned O'Bryan to a location where they ambushed him, attacked him, and beat him, and may have stabbed him.

5. The affidavits in support of the Warrants detailed that O'Bryan was able to break away from other HAMC members and escaped. During that escape, the Warrants accused HAMC members of shooting at the escaping member with a firearm.

6. The affidavits in support of the Warrants accused Ullerich of being present during this assault and attempted murder of O'Bryan.

7. The affidavits in support of the Warrants detailed a second series of events, where HAMC Members were accused of luring O'Bryan to another location, kidnapping him, beating him unconscious, and bringing him to Ullerich's tattoo parlor.

8. The Warrants were valid.

9. The Warrants alleged nineteen violations of Colorado's criminal code against Ullerich, including first- and second-degree assault, kidnapping, and other various crimes.

10. The issuing court authorized the Warrants to be executed as no-knock immediate entry warrants.

11. At the ATF's request, all fifteen (15) warrants associated with the criminal case were executed simultaneously by the participating agencies at 4 a.m. on November 7, 2019.

12. The execution of both warrants was part of a complex, multi-location, multi-jurisdictional effort involving nineteen (19) distinct locations and fifteen (15) distinct individuals.

13. Former defendant Donohue was a JCRS team leader and responsible for the operation plan associated with Ullerich's residence.

14. Donohue has received training both in SWAT operations and in SWAT leadership.

15. Donohue was aware of the charges asserted against Ullerich in the Warrants.

16. Brown and Donohue were aware that Ullerich did not have any other criminal history.

17. The operation plan for Ullerich's residence, 2301 Youngsfield Street, Golden, Colorado 80401, was completed by the JCRS team leader according to the JCRS's procedures and approved by Jefferson County Patrol Chief Al Simmons.

18. The operation plan called for execution of the Warrants by way of an explosive breach of Ullerich's front door, combined with window breaches. The first listed contingency for the explosive breach was a mechanical breach of the front door.

19. The operation plan provided for the following contingencies: "If the door cannot be mechanically breached, entry team will transition to the main door on the #2 side of the structure to attempt a mechanical breach. If the secondary breach point cannot be breached, the team will fall back and contain and callout protocols will begin."

20. A "contain and call-out" procedure would involve the JCRS falling back to armored cover or concealed positions and ordering any individuals in the house out with a loudspeaker.

21. A mechanical breach involves the use of a ram, or a combination of a ram and a 'pick' to force the door to open to JCRS members.

22. The JCRS operators were aware that Ullerich was known to carry a gun on him.

23. Brown had been a member of the JCRS for two years and was assigned to the JCRS executing the Warrants.

24. Brown was on the team tasked with executing the warrant for Ullerich's residence and Ullerich, should he be at the residence during the search.

25. Brown was trained in the use of breaching rounds and the breaching shotgun by the JCRS and the Rocky Mountain Tactical Team Association ("RMTTA").

26. Brown's training with the breaching shotgun included training about how to angle and discharge the breaching round into the door frame to minimize the risk to the occupants inside.

27. On November 7, 2019, Brown was outfitted with the breaching shotgun he had trained with during all JCRS training and carried with him to prior JCRS deployments.

28. While the operational plan had originally called for the use of an explosive breach of the front door of Ullerich's residence, the JCRS and specifically Defendant Donohue modified that plan during briefing based on intelligence information that individuals were present and potentially awake in the home.

29. This modification was intended to decrease the risk of injury associated with the warrant execution.

30. The operational plan was modified from an explosive breach to the first listed contingency, which was a mechanical breach of the same door using a ram.

31. Because the method of breach into Ullerich's home was modified, Defendant Donohue modified the tactics associated with the entry. The operation remained a "breach, bang, and hold" operation.

32. The operation began with the JCRS approaching Ullerich's front door from the right side, with one element moving to his door and front windows and the other team moving to the side window.[1]

[1] Ullerich's door camera captured the actions of the JCRS team.

33. Former defendant Jordan Bybee—another member of the JCRS team—and Brown were assigned to breach the door.

34. Donohue gave the command to initiate once the team was in position outside Ullerich's front door and side window.

35. Bybee struck the door with a ram six times. The door had not opened after the sixth strike.

36. As Bybee struck the door with the ram, other members of the JCRS team broke Ullerich's side windows.

37. Donohue moved to the broken windows on the front of the house and issued verbal commands. Donohue said something to the effect of "sheriff's office, search warrant, come to the door" into the house from the broken windows. This command was repeated twice.

38. After Bybee struck the door with the ram for the sixth time, and the door failed to open, Brown approached the door frame.[2]

**b. Disputed Facts**

The parties dispute what transpired after Brown approached Ullerich's door. Ullerich's door camera recorded most of Brown's actions: after disabling the shotgun's safety, he fired a breaching round. That round, or portions of it, struck Ullerich, who had

---

[2] This statement of fact is drawn from the video of the events of this case, not the SOF. *See* ECF No. 143; *see also* SOF at ¶ 54 (Ullerich does not dispute that Brown positioned himself to breach the door).

opened the door. However, the video does not show when the door opened. Brown contends that the door opened just as he pulled the trigger of the shotgun, leaving him with no time to react. ECF No. 141 at ¶¶ 57-68; *see also* ECF No. 175 at 8. Ullerich argues that "the door was already open when Brown fired." ECF No. 177 at 8. It is undisputed that the events at issue "happened quickly." ECF No. 141 at ¶ 59.

Having established the "universe of facts" that will govern Brown's request for summary judgment, *see Love v. Grashorn*, 134 F.4th 1109, 1113 (10th Cir. 2025), the Court will consider whether Brown is entitled to assert qualified immunity.

## III. ANALYSIS

Ullerich asserts two violations of his Fourth Amendment rights:

> (1) that Brown's unannounced firing of his breaching shotgun in the midst of a mechanical breach, at a point when occupants are typically responding to pounding and being commanded to the front door by the team leader, and while Ullerich was, in fact, being so commanded by Donohue, violated the Fourth-Amendment prohibition against "unreasonable searches," and (2) that Brown's firing a breaching round into Ullerich's abdomen, as opposed to downward into the doorframe, after the door was opened, constituted excessive force.

ECF No. 177 at 10. The Court will examine each alleged violation, but first it must consider a threshold issue raised by Brown.

Brown argues that although Ullerich frames the unannounced firing of the shotgun as an "unreasonable search," it is in fact an allegation of "excessive force" which should be analyzed as an unreasonable seizure. ECF No. 179 at 1. Ullerich disagrees, but he does not explain how being shot could constitute a "search." ECF No. 177 at 1. Brown's arguments are persuasive. A "search" under the Fourth Amendment occurs when the

government intrudes into a "private sphere" over which an individual exhibits a reasonable expectation of privacy. *See Carpenter v. United States*, 585 U.S. 296, 304 (2018). In contrast, "[t]he application of physical force to the body of a person with intent to restrain is a seizure." *Torres v. Madrid*, 592 U.S. 306, 325 (2021). Mr. Ullerich has not cited any case where a plaintiff who was shot by police successfully framed the issue as an unreasonable search. Thus, the Court will analyze both Ullerich's claims as excessive force claims under the Fourth Amendment.

In excessive force cases, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). Courts review excessive force claims under a standard of objective reasonableness, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). And the analysis must always account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. "A reasonable officer need not await 'the glint of steel' before taking self-protective action; by then, it is 'often…too late to take safety precautions.'" *Larsen*, 511 F.3d at 1260 (quoting *People v. Morales*, 198 A.D.2d 129, 603 N.Y.S.2d 319, 320 (N.Y. App. Div.1993)). Courts analyze "the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

In considering whether a suspect poses a threat, Courts again consider the totality of the circumstances but frequently ask "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Larsen*, 511 F.3d at 1260. An officer's assessment of the threat posed by a suspect "need not be correct…as long as it is reasonable." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015).

But, as stated above, even if an officer uses unreasonable force against a person, the officer is still entitled to qualified immunity unless the plaintiff can show that the defendant violated a right that was clearly established at the time. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A right is "clearly established when a Supreme Court or Tenth Circuit precedent is on point or the alleged right is clearly established from case law in other circuits." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017). Precedent is considered "on point" if "it involves

materially similar conduct or applies with obvious clarity to the conduct at issue." *Womble v. Chrisman*, 173 F.4th 1186, 1195 (10th Cir. 2026).

A case with material similarity is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts." *Baca v. Cosper*, 128 F.4th 1319, 1327 (10th Cir. 2025) (quoting *Mullenix*, 577 U.S. at 12), *cert. denied*, 146 S. Ct. 354 (2025). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

The Supreme Court has admonished courts that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). In the absence of materially similar precedent, a general rule will only serve as "clearly established law" when it "states the contours of a constitutional transgression in a well-defined or well-marked manner without leaving a vaguely-defined legal border." *Asaheed v. Currington*, 7 F.4th 1236, 1246 (10th Cir. 2021) (internal quotation marks omitted) (quoting *Janny v. Gamez*, 8 F.4th 883, 918 (10th Cir. 2021)) (collecting cases in which a general rule established a constitutional violation).

"The plaintiff bears the burden of citing…what he thinks constitutes clearly established law." *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010). "Although plaintiffs need not cite a case with identical facts to demonstrate a clearly established

right, existing precedent must place the statutory or constitutional question beyond debate.'" *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020) (internal quotation marks and alterations omitted) (quoting *al-Kidd*, 563 U.S. at 741).

As stated above, Ullerich must show that Brown committed a violation of a constitutional right that was clearly established in 2019. *Puller*, 781 F.3d at 1196. If he fails to satisfy either requirement, then the Court must grant Brown qualified immunity. *Medina*, 252 F.3d at 1128. The Court may analyze either issue first. *Thomson*, 584 F.3d at 1312 n.2.

**a. Clearly Established**

The Court will first ask whether the rights asserted by Ullerich were clearly established in 2019. Ullerich states that there is no case directly on point. "This alone should [be] an important indication" that Brown's conduct "did not violate a 'clearly established' right." *See White*, 580 U.S. at 80 (criticizing a lower court's decision to deny qualified immunity in a case that presented a "unique set of facts and circumstances."). Instead Ullerich cites a series of more general cases: *Lawmaster v. Ward*, 125 F.3d 1341, 1350 (10th Cir. 1997)), *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), *Love v. Grashorn*, 134 F.4th 1109, 1119 (10th Cir. 2025), *Groh v. Ramirez*, 540 U.S. 551, 563-64 (2004). The Court will examine each in turn.

The facts in *Lawmaster* are not materially similar to the facts in this case, nor do they apply with obvious clarity. The police in *Lawmaster* executed a warrant to search the plaintiff's home. 125 F.3d at 1344. They entered the home while it was unoccupied. *Id.*

Once inside, the officers "ransacked" the home: the plaintiff alleged they tracked dog feces inside and scattered cigar and cigarette ashes throughout the house, among other things. *Id.* at 1346. No one was shot. *Id.*

Ullerich cites *Lawmaster* for the proposition that "[t]he Fourth Amendment binds the officers such that the right to search a home concomitantly obliges the officers to do so in a reasonable manner." ECF No. 177 at 17. True, the Tenth Circuit found that it was "well established [that] the Fourth Amendment is in place to preserve the sanctity of the home to the largest extent consistent with the reasonable exercise of law enforcement duties." *Lawmaster*, 125 F.3d at 1351. But the court did not discuss the reasonableness of the officers' conduct in entering the home. The Court cannot find that *Lawmaster* would place a reasonable police officer on notice that the use of a breaching shotgun during the execution of a no-knock warrant was unreasonable, nor would it have any bearing on an intentional shooting. The proposition cited by Ullerich is a "general rule." *See Asaheed*, 7 F.4th at 1246. It does little more than restate the Fourth Amendment itself in saying that police conduct must be reasonable.

*Holland* does not involve materially similar facts either. 268 F.3d 1179 (10th Cir. 2001). In that case, the officers in question approached a residence and held several people—including children—at gunpoint and forced them to lay face down on the ground. *Id.* at 1183-84. The officers did not shoot anyone, and it does not appear that they had to force their way into the home. *Id.*

The Tenth Circuit did find that the officers' conduct violated the Fourth Amendment, but not for any reason applicable here. The Tenth Circuit stated: "[w]hile the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation outside the residence was not justified under the circumstances at that point." *Id.* at 1193. In this case, the JCRS officers had not "gained complete control of the situation." They were still actively trying to enter Ullerich's residence. And Ullerich, unlike the children in *Holland,* was accused of several violent crimes. Even taking as true Ullerich's assertion that Brown shot him intentionally, *Holland* is not applicable.

Finally, Ullerich argues that Brown is not entitled to qualified immunity because he violated his training by using the breaching shotgun without communicating with Donohue and without making an appropriate announcement. In support of this assertion, Ullerich cites *Groh v. Ramirez*. ECF No. 177 at 19. In that case, the Supreme Court considered whether a police officer was entitled to qualified immunity where he executed a warrant that "plainly did not comply" with the Constitution's particularity requirement. *Groh v. Ramirez*, 540 U.S. 551, 563-64 (2004). The Supreme Court noted that the "guidelines of [the officer's] own department placed him on notice that he might be liable for executing a manifestly invalid warrant." *Id.* at 564. But the Court did not say that the officer was liable merely because he violated his department's guidelines. It referenced the guidelines only as proof that the prohibition against the execution of manifestly invalid warrants was clearly established. *Id.* Here, for the Supreme Court's analysis in *Groh* to

apply, it would have to have been so clearly established that the misuse of breaching shotguns violated the Constitution that the JCRS team's policies and guidelines warned Brown of that fact. Again, the Court does not find that the Supreme Court's holding in *Groh* would put Brown on notice that using a breaching shotgun improperly, or shooting a suspect, would violate the Fourth Amendment.

To summarize, Ullerich has not presented any case with materially similar facts to this one. On the contrary, he has asked the Court to find that a swathe of different cases apply "with obvious clarity." ECF No. 177 at 16. But the Court declines to do so. None of the cases cited by Ullerich involved the use of breaching shotguns or other tools during the execution of a warrant. None involved a plaintiff who was told to "come to the door" by officers and subsequently injured. And none involved an officer shooting a person while executing a no-knock warrant. Thus, none apply with obvious clarity.

Instead, multiple cases with similar facts demonstrate the law regarding breaching equipment was far from clearly established in 2019. Brown cites *Koetter v. Davies* as an example of a case where an officer was entitled to qualified immunity even though he hit a plaintiff with a round from a breaching shotgun. ECF No. 175 at 15 (citing *Koetter v. Davies*, No. 2:07-cv-724, 2010 WL 3791482 (D. Utah Sept. 22, 2010)). But courts examining the use of breaching shotguns in other circumstances have reached the opposite conclusion. For example, in *Fernandez v. City of Rochester*, a court ruled that an officer who breached an apartment door with a breaching shotgun was not entitled to qualified immunity at the summary judgment stage because the plaintiff alleged that the

officer could see that the plaintiff was standing behind the door. No. 22-CV-06162-FPG, 2025 WL 1643940, at *6 (W.D.N.Y. June 10, 2025). Both cases are unpublished district court opinions, and thus cannot determine whether a right was clearly established. *See, e.g.*, *Mecham v. Frazier,* 500 F.3d 1200, 1206 (10th Cir. 2007) ("[a]n unpublished opinion…provides little support for the notion that the law is clearly established on [a] point."). "But an unpublished opinion can be quite relevant in showing that the law was *not* clearly established." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) (emphasis in original).

The most materially similar case of which the Court is aware that might have put Brown on notice regarding the use of breaching equipment is the case *Brown*[3] *v. City of Colo. Spgs.*, 709 F. App'x 906, 908 (10th Cir. 2017), and even that case is not binding authority. In *Brown*, police officers used explosives to blow a hole in the plaintiff's floor to access his basement, where they believed he had barricaded himself. Unbeknownst to them, the plaintiff was directly beneath the explosive charge, and he was seriously injured when it detonated. The Tenth Circuit ruled that the officers were entitled to qualified immunity because any rights that the officers had violated were not clearly established. *Id.* at 914. Thus, even *Brown* would not have clearly established that Brown would violate Ullerich's rights by using the breaching shotgun.

[3] A different Brown than the defendant in this case.

In short, Ullerich has not shown that the constitutional question regarding the use of breaching equipment was "beyond debate." *See al-Kidd*, 563 U.S. at 741. Rather, that is exactly the debate in this case.

The same is true of Ullerich's argument that Brown shot him on purpose. Ullerich has not directed the Court to any case where an officer in Brown's circumstances violated the Fourth Amendment by shooting a suspect. Relying only on the undisputed facts in this case, a reasonable officer in Brown's position could have found that shooting Ullerich was necessary in light of the totality of the circumstances. *See Graham*, 490 U.S. at 396. Ullerich was accused of felony kidnap and assault, along with over a dozen other serious crimes. *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent."). He was known to carry a firearm and thus had the potential of deploying deadly force. *See Est. of Waterhouse v. Direzza*, No. 21-cv-00982, 2023 WL 6878401, at *13 (D. Colo. Oct. 18, 2023), *aff'd,* 129 F.4th 121 (10th Cir. 2025). Brown had been sent to arrest Ullerich as part of a massive multi-agency operation. Brown was to arrest Ullerich at 4:00 a.m., at which time other agencies would be arresting other suspects. Brown was standing inches away from the door when it was suddenly opened by Ullerich. Even if Brown had then shot Ullerich intentionally, that act would have been a "split-second judgment" in a situation that was "tense, uncertain, and rapidly evolving." *See Graham*, 490 U.S. at 397. Ullerich has not directed the Court to any cases where an officer violated the Fourth

Amendment by making a split-second decision to shoot a suspect—known to be armed and accused of a violent crime—that appeared suddenly in a doorway a short distance from the officer. Therefore, the Court must grant Brown qualified immunity.

**b. Violation of a Right**

The Court has already ruled that any rights violated by Brown were not clearly established, and thus qualified immunity applies. This ends the inquiry. Nonetheless, given the undisputed facts of this case, Ullerich has not satisfied his burden of showing that any of his rights were violated. Despite alleging that Brown shot him intentionally, he has not analyzed the *Graham* factors to show that such a shooting was unreasonable and therefore unconstitutional. On the contrary, Ullerich did present a real threat: he was accused of violent crimes, was known to carry a firearm, and appeared in front of Brown only a few feet away, leaving him no time to react. Thus, if Brown mistakenly believed Ullerich was armed and shot him, that decision would have been a "reasonable but mistaken judgment" that force was necessary. *See al-Kidd*, 563 U.S. at 743.

Ullerich cites *Love v. Grashorn* for the proposition that an officer who has "made an unreasonable mistake…would not be entitled to qualified immunity." ECF No. 177 at 19 (quoting *Love v. Grashorn*, 134 F.4th 1109, 1119 (10th Cir. 2025)). But Ullerich has not shown any facts that would make a mistaken judgment by Brown unreasonable. In *Grashorn*, the Tenth Circuit considered whether shooting a dog violated the Fourth Amendment. The central issue was whether the officer had mistakenly perceived the dog as dangerous. *Grashorn*, 134 F.4th at 1116. The trial court denied qualified immunity

because the plaintiffs pointed to facts that suggested the dog was not dangerous. But *Grashorn*'s analysis of whether a dog is dangerous does not apply to this case. In an excessive force case involving a human, an officer's use of force is analyzed through the *Graham* and *Larsen* factors, which Ullerich mentions but does not analyze. The undisputed facts show that several of the *Graham* factors would support finding Brown's actions as reasonable. And unlike the plaintiffs in *Grashorn*, Ullerich has not presented sufficient additional facts to swing the analysis back in his favor.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments…When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Here, Ullerich has not shown that Brown was plainly incompetent or knowingly violated the law.

## IV. CONCLUSION

In conclusion, the Court finds that Defendant Brown's Fed. R. Civ. P. 56 Motion for Summary Judgment, ECF No. 175, should be **GRANTED**. Accordingly, it is **ORDERED** that this matter is **DISMISSED**, and all other outstanding motions, ECF Nos. 171, 173, 178, and 183, are **DENIED** as moot.

Dated: September 21, 2026

BY THE COURT:

REGINA M. RODRIGUEZ
United States District Judge